## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

AMERICAN BROADCASTING COMPANIES, INC., THE
ASSOCIATED PRESS, CABLE NEWS NETWORK LP,
LLLP, CBS BROADCASTING INC., FOX NEWS
NETWORK LLC, and NBC UNIVERSAL, INC.

         Plaintiffs,

    *- against -*

J. KENNETH BLACKWELL, in his official capacity as
the SECRETARY OF STATE OF OHIO,

         Defendant.

Cause No. **1:04 C V 750**

Judge Watson

**FILED**

Magistrate Judge Black

NOV 0 1 2004

**JAMES BONINI, Clerk**
CINCINNATI, OHIO

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs American Broadcasting Companies, Inc., The Associated Press, Cable News Network LP, LLLP, CBS Broadcasting Inc., Fox News Network LLC, and NBC Universal, Inc. ("Plaintiffs") for their Complaint state as follows:

### JURISDICTION AND VENUE

1.   This action arises under and pursuant to the Constitution of the United States and the First and Fourteenth Amendments thereof and 28 U.S.C. §§ 2201 and 2202 and 42 U.S.C. §§ 1983 and 1988. This Court has jurisdiction of this action under 28 U.S.C. §§ 1331 and 1343.

2.   Venue is proper in this district under 28 U.S.C. §§ 1391(b) because a substantial part of the real and immediate harm faced by Plaintiffs is threatened in this judicial district and Defendant resides in this judicial district.

## THE PARTIES

3.      Plaintiff American Broadcasting Companies, Inc. ("ABC") is a corpora-

tion organized and existing under the laws of the State of Delaware with its principal place of

business at 77 West 66th St, New York, New York 10023.  ABC is engaged, *inter alia*, in the

gathering of news, the production of news programming, and the transmission of news pro-

gramming to its affiliated broadcast stations in the State of Ohio and throughout the country.

4.      Plaintiff The Associated Press ("AP") is a mutual news cooperative

formed under the New York Not For Profit Law with its principal place of business at 450 West

33rd St., New York, New York 10001.  The AP is a news network that serves thousands of daily

newspaper, radio, television and online customers with coverage in all media and news in all

formats.

5.      Plaintiff Cable News Network LP, LLLP ("CNN") is a limited liability lim-

ited partnership registered under the law of the State of Georgia with its principal place of busi-

ness at 1 CNN Center, Atlanta, Georgia 30303.  CNN is engaged, *inter alia*, in the gathering of

news, the production of news programming, and the transmission of news programming in Ohio

and throughout the country on its affiliated cable networks.

6.      Plaintiff CBS Broadcasting Inc. ("CBS") is a corporation organized and

existing under the laws of the State of New York with its principal place of business at 51 West

52nd Street, New York, New York 10019.  CBS is engaged, *inter alia*, in the gathering of news,

the production of news programming, and the transmission of news programming to its affiliated

broadcast stations in the State of Ohio and throughout the country.

7.      Plaintiff Fox News Network LLC ("FOX")  is a limited liability corpora-

tion organized and existing under the laws of the State of Delaware with its principal place of

business 1211 Avenue of the Americas, New York, New York 10036.  FOX is engaged, *inter*

-2-

*alia*, in the gathering of news, the production of news programming, and the transmission of news programming in Ohio and throughout the country on its affiliated cable networks.

8.      Plaintiff NBC Universal, Inc. ("NBC") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 30 Rockefeller Plaza, New York, New York 10112.  NBC is engaged, *inter alia*, in the gathering of news, the production and dissemination of news programming, and the transmission of news programming to its affiliated broadcast stations in the State of Ohio and throughout the country.

9.      Defendant J. Kenneth Blackwell is the Secretary of State of the State of Ohio.  As Secretary of State, Blackwell is the chief election officer of the State of Ohio.  As Secretary of State, Blackwell is also responsible for obtaining and maintaining uniformity in the application, operation and interpretation of the provisions of the Ohio election laws and for instructing the county boards of election as to election procedures consistent with the law of Ohio.  Blackwell is named herein in his official capacity as Secretary of State.

## PLAINTIFFS' NEWSGATHERING ACTIVITIES

10.      In order to better inform the public about voting behavior, voting trends, and voters' reactions to important issues of the day, Plaintiffs conduct polls of voters leaving polling places on election days (sometimes referred to as "exit polls") at selected polling places throughout the country.

11.      The exit polls are conducted as follows:  Typically one polling reporter is assigned to each of the polling places randomly selected for the polls.  The reporter stands just outside the exit of the building in which the polling place is located.  Polling reporters are instructed to be courteous and businesslike and not to interfere with the election process in any way.  The polling reporters approach voters after they leave the polling place in a scientifically pre-determined pattern (*i.e.,* every fourth voter, every fifth voter, etc.) and ask if they would be

-3-

willing to fill out a brief, anonymous questionnaire. The typical questionnaire solicits voters' views on various political topics of the day and requests demographic information from each participating voter. Each participating voter is also asked how he or she voted.

12. Exit polls provide accurate data about voter behavior because of the near certainty that the persons interviewed have actually voted. The greater the distance from the polling place that the polling reporter is required to stand, however, the less reliable is the information gathered. A distance restriction will have a different impact on exit polling at any particular precinct depending on the particular layout of the area – for example, how close the parking lot is to the polling place. Requiring polling reporters to stand at least 100 feet from the place where voters exit the polling place at all precincts is likely to substantially impact their exit polling activities and, accordingly, to substantially reduce the statistical reliability and accuracy of their exit polls.

## USE OF EXIT POLL DATA BY PLAINTIFFS AND OTHERS

13. Each of the Plaintiffs specifically, and other members of the public generally, use the information obtained from exit polls in a variety of ways. The results of these polls are used by Plaintiffs, *inter alia*, to analyze and report upon how and why people have voted and to identify and comment on social and political trends. For example, in 1980, exit polls provided the information from which the "gender gap" was first clearly identified and from which all subsequent analyses of this phenomenon have begun. During the 1988 presidential primaries, exit polls provided information that indicated that the gender gap was a continuing phenomenon and provided invaluable insights on voters' views concerning the first Black-American presidential candidate. In the 1992 Republican primary, exit polls showed the populist issues that led to Pat Buchanan's near-success and the reasons for President Bush's ultimate defeat in the general elec-

-4-

tion. These examples illustrate the unique value of exit polls in permitting analysis of the voting patterns of various groups according to sex, age, income, race and religion. The information gathered from exit polls has also been used by Plaintiffs in their election coverage and in formulating projections of the outcome of certain election contests.

14. The data obtained through exit polls is also used by scholars in many disciplines including, *inter alia*, political science, sociology, and history to analyze and comment upon how and why people have voted and to identify and comment on social and political trends. The exit poll data collected by Plaintiffs is archived after each election at the Roper Center at the University of Connecticut and at the Inter-University Consortium at the University of Michigan. The information is available through those archives to historians, social scientists, and others worldwide.

15. Exit polls are the most reliable and accurate method for gathering information from voters themselves on election day about how and why they have voted.

## PLAINTIFFS' ACTIVITIES IN OHIO

16. Plaintiffs have conducted exit polls within 100 feet of polling places in the State of Ohio as part of their coverage of past elections, as recently as the March 2004 presidential primary elections, without incident or any complaint by the Secretary of State.

17. Prior to the March 2004 primaries, Defendant issued Advisory No. 2004-02, dated February 24, 2004, to "all boards of elections, members, directors, and deputy directors" (the "February Advisory"). The February Advisory summarized Ohio election laws R.C. §§ 3501.30, 3501.35, and 3599.4, which regulate election campaigning and other activities within 100 feet of a polling place, but not exit polling, and specifically advised the boards of elections that the "statutes do not regulate or specifically address exit polling." The boards were further advised that "in keeping with Ohio's past practices, exit pollsters should not be disturbed

-5-

solely because they are conducting exit polling within the 100-foot boundary." The February

Advisory further stated that the Secretary of State "anticipated that exit pollsters from news or-

ganizations will conduct themselves in a professional and cooperative manner." A true and cor-

rect copy of the February Advisory is annexed hereto as Exhibit A.

### DEFENDANT'S UNLAWFUL ORAL DIRECTIVE

18.     Plaintiffs intend to conduct exit polls at approximately 50 precincts in

Ohio, 23 of which are within this district, during the general election November 2, 2004.

19.     In May 2004, Plaintiffs, through their representative Mitofsky Interna-

tional, requested a written statement from Defendant that they would be permitted to conduct

exit polls within 100 feet of Ohio polling places during the November 2004 election, as they

have done in the past.

20.     Patricia Wolfe, Director of Elections in Defendant's office, responded on

July 6, 2004 by e-mail that Defendant's office would "provide to all 88 county boards of elec-

tions an advisory on exit polling as we did in February for Ohio's March primary" and attached a

copy of the February Advisory. Despite numerous follow-up requests by Plaintiffs' representa-

tive, Defendant's office never sent the promised advisory or any other written confirmation of

the Plaintiffs' right to conduct exit polls.

21.     On Thursday, October 28, 2004, Plaintiffs' representative was informed

by a county elections official that he and other officials had been instructed by Defendant in a

telephone conference call on Thursday, October 28, 2004 to prohibit exit polling within 100 feet

of the polling place. Dozens of attempts on Thursday and Friday to clarify this report with the

Defendant's office were unsuccessful.

22.     Not until after the close of business on Friday, October 29, 2004 did a rep-

resentative from Defendant's office, Keith Scott, return a call to Plaintiffs' attorney. During this

call, Mr. Scott confirmed that Defendant has instructed the county boards of election not to permit exit polling within 100 feet of Ohio polling places (the "Oral Directive").

23.     Mr. Scott confirmed that he was familiar with the substance of the February Advisory, which explicitly permits exit polling and states unambiguously that exit polling is not regulated by R.C. §§ 3501.30, 3501.35, or 3599.4, but reiterated that exit polling would nevertheless not be allowed in the 100-foot zone.

24.     The Secretary of State exceeded his authority in issuing the Oral Directive because, as he previously conceded, no Ohio law, including Ohio election laws R.C. §§ 3501.30, 3501.35, or 3599.4, regulates, addresses, or in any manner restricts the conduct of exit polls in Ohio on election day.

## COUNT I

25.     Plaintiffs repeat, reallege, and incorporate the allegations of paragraphs 1 through 24 hereof as though fully set forth herein.

26.     By prohibiting the interviewing of voters, after they have voted, within 100 feet of Ohio polling places, the Oral Directive impermissibly restricts Plaintiffs' speech and commentary about the political process and thus violates the First Amendment to the United States Constitution as made applicable to the states through the Fourteenth Amendment.

27.     By prohibiting the interviewing of voters, after they have voted, within 100 feet of Ohio polling places, the Oral Directive impermissibly restricts Plaintiffs' opportunities to gather and receive information about the political process and thus violates the First Amendment to the United States Constitution as made applicable to the states through the Fourteenth Amendment.

28.     Plaintiffs seek to conduct exit polls within 100 feet of polling places in the State of Ohio on this upcoming election day, November 2, 2004, and on election days in the fu-

ture. If the Oral Directive were enforced, Plaintiffs will be significantly restricted in their efforts to gather and report truthful and significant information about the political process to the public, thus causing Plaintiffs irreparable harm for which there is no adequate remedy at law.

WHEREFORE, Plaintiffs pray:

1.      That this Court declare that the Oral Directive violates the First Amendment to the United States Constitution as made applicable to the states through the Fourteenth Amendment.

2.      That this Court enter a temporary restraining order restraining Defendant and all those acting in concert with him from enforcing the Oral Directive on November 2, 2004, and directing Defendant to advise all 88 boards of elections, no later than 8:00 p.m. on Monday, November 1, 2004, that Plaintiffs may conduct exit polls within 100 feet of the polling place on election day.

3.      That this Court preliminarily enjoin Defendant and all those acting in concert with him from enforcing the Oral Directive.

4.      That this Court permanently enjoin Defendant and all those acting in concert with him from enforcing the Oral Directive.

5.      That this Court order such further or different relief as it may deem just and proper, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and the costs of this action.

Dated: November 1, 2004.

Respectfully submitted,

FROST BROWN TODD LLC

By: _____
     Richard Goehler (0009160)
     Maureen Haney (0070920)

2200 PNC Center
201 East Fifth Street
Cincinnati, Ohio 45202-4182
Telephone: (513) 651-6711
E-Mail: rgoehler@fbtlaw.com

*Counsel for Plaintiffs American Broadcasting
Companies, Inc., The Associated Press, Cable News
Network LP, LLLP, CBS Broadcasting Inc., Fox News
Network LLC, and NBC Universal, Inc.*

Of Counsel:

Susan Buckley
S. Penny Windle
CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, New York 10005