**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

American Broadcasting Company,
Inc., *et al.*,

       Plaintiffs,

   v.                                     Case No. 1:04cv0750

J. Kenneth Blackwell,                    Judge Michael H. Watson

       Defendant.

## OPINION AND ORDER

This case concerns the right of news organizations to conduct exit polls within 100 feet of polling places in Ohio on election days.  Plaintiffs bring this action under 42 U.S.C. § 1983, asserting, *inter alia,* defendant's directives limiting access to the area within 100 feet of polling stations violate plaintiffs' rights to free speech and due process guaranteed by the First and Fourteenth Amendments to the U.S. Constitution.  Plaintiffs additionally contend Ohio's loitering statutes violate the First Amendment to the extent they could be applied to prohibit plaintiffs from conducting exit polls within 100 feet of polling places.  This matter is before the Court on the parties' cross-motions for summary judgment (Docs. 44 and 51).  For the reasons that follow, the Court grants plaintiffs' summary judgment motion in part and denies it in part.  The Court likewise grants defendant's summary judgment motion in part and denies it in part.

## I. Facts

With one notable exception, the parties do not dispute the material facts.

### A. The Parties

Plaintiffs are: American Broadcasting Companies, Inc.; The Associated Press;

Cable News Network LP, LLLP; CBS Broadcasting Inc.; Fox News Network LLC; and

NBC Universal, Inc. All plaintiffs engage in the gathering and transmission of news,

and all plaintiffs conduct exit polls.

Defendant J. Kenneth Blackwell is the Ohio Secretary of State, a duly elected

public official. Ohio Rev. Code § 111.01. Plaintiffs sue defendant in his official capacity

only. As Secretary of State, defendant is the chief election officer of the State of Ohio.

Ohio Rev. Code § 3501.04. He is responsible for obtaining and maintaining uniformity

in the application, operation and interpretation of Ohio election laws and for instructing

county boards of election concerning election procedures consistent with Ohio law.

*See* Ohio Rev. Code § 3501.05.

### B. Exit Polls

The New York Times credits the late Warren J. Mitofsky with originating the exit

polling process in 1967 while he was employed by CBS News. Adam Clymer, *Warren*

*J. Mitofsky, 71, Innovator Who Devised Exit Poll,* N.Y. Times, Sept. 4, 2006 at A17.

Plaintiffs submit Mitofsky's affidavit, *inter alia,* to explain exit polling.

Mitofsky defined the term "exit poll" as the gathering of data from a random

sample of voters at polling places on election day. Mitofsky Aff. ¶ 5. To accomplish

this, a reporter stands just outside the exit of the polling place, and in a scientifically

pre-determined pattern asks emerging voters to fill out a short questionnaire. *Id.* Polling reporters wear badges identifying them as representatives of plaintiffs' news organizations. Mitofsky Aff. ¶ 7. Polling reporters are instructed to be courteous and businesslike, and not to interfere with the election process in any way. *Id.* Exit poll reporters inform voters that their participation in an exit poll is purely voluntary. *Id.*

Mitofsky explained that exit polls provide accurate data about voter behavior because of the near certainty that the individuals interviewed actually voted. Mitofsky Aff. ¶ 8. Mitofsky represented that as the distance between the reporter and the polling place increases, the information gathered becomes less reliable. *Id.* The greater the distance, the greater the likelihood the voter will get in his car and drive away, or blend into a crowd of non-voters. Mitofsky Aff. ¶ 9. Also, as the distance increases, it becomes more difficult to differentiate voters from non-voters, and increasing the distance between the polling place and the reporter makes it impossible to interview in a scientifically selected pattern. *Id.* As an example of the impact of distance on the accuracy of exit polls, Mitofsky averred that during the November 2004 election, exit polls conducted 100 feet or more from the polling place had more than twice the statistical error rate as polls conducted within twenty-five feet of the polling place. Mitofsky Aff. ¶ 10. Defendant does not dispute Mitofsky's assertions concerning the affect of distance on the accuracy of exit polls.

News organizations utilize information gathered from exit polls to analyze and report upon voters' attitudes on issues of public concern, and to determine who voted for particular candidates and why. *See* Mitofsky Aff. ¶ 27. Plaintiffs use exit poll data to

prepare election night news reports. Data gathered from exit polls is archived at the

Roper Center at the University of Connecticut, and the Inter-University Consortium at

the University of Michigan. Mitofsky Aff. ¶ 29. Historians and political scientists have

access to the data stored at the archives. *Id.*

Defendant acknowledges exit polls are an important exercise of free speech

protected by the First Amendment to the U.S. Constitution.

### C. Defendant's Directives

Defendant's directives to local election officials at issue in this case all concern

the application of certain Ohio election laws referred to by the parties as the Loitering

Statutes. *See* Ohio Rev. Code §§ 3501.30, 3501.35 and 3599.24. The Loitering

Statutes provide in relevant part:

> During an election and the counting of the ballots, no person shall loiter or
> congregate within the area between the polling place and the small flags
> of the United States placed on the thoroughfares and walkways leading to
> the polling place; in any manner hinder or delay an elector in reaching or
> leaving the place fixed for casting his ballot . . .
> No person, not an election official, employee, witness, challenger, or
> police officer, shall be allowed to enter the polling place during the
> election, except for the purpose of voting.

Ohio Rev. Code § 3501.35

> Two or more small flags of the United States approximately fifteen inches
> in length along the top, which shall be placed at a distance of one
> hundred feet from the polling place on the thoroughfares or walkways
> leading to the polling place, to mark the distance within which persons
> other than election officials, witnesses, challengers, police officers, and
> electors waiting to mark, marking, or casting their ballots shall not loiter,
> congregate, or engage in any kind of election campaigning.

Ohio. Rev. Code § 3501.30(A)(4).

(A) No person shall do any of the following:

* * *

(5)     Loiter in or about a registration or polling place during registration or the casting and counting of ballots so as to hinder, delay, or interfere with the conduct of the registration or election;

* * *

Ohio Rev. Code § 3599.24.

Defendant issued Advisory No. 2004-02 to all county election officials on

February 24, 2004 in anticipation of the March 2, 2004 presidential primary. The

February Advisory provided in pertinent part:

Exit polling will be conducted by news organizations for the March 2 Primary Election. The boards are reminded that R.C. 3501.30, 3501.35 and 3599.24 collectively prohibit *anyone*, on election day, from:

• Engaging in election campaigning within 100 feet of the entrance to a polling place.

• Entering a polling place for any reason other than to vote, unless the person is an election official, a challenger or witness appointed pursuant to R.C. 3505.21, or a police officer.

• Loitering, congregating, hindering or delaying a person from reaching or leaving the polling place.

These statutes do not regulate or specifically address exit polling. Boards are advised that, in keeping with Ohio's past practices, exit pollsters should not be disturbed solely because they are conducting exit polling within the 100-foot boundary. However, if election officials and/or law enforcement officers determine that an exit pollster has unduly hindered or delayed a voter from entering or exiting the polling place, or has been disruptive in violation of the law, appropriate action should be taken. Exit polling is *not* permitted, under any circumstance, inside any building where the voting is conducted.

It is anticipated that exit pollsters from news organization will conduct themselves in a professional and cooperative manner. Please advise your precinct officials of the possibility of exit pollsters at their precincts.

Plaintiffs conducted exit polls on March 2, 2004 within 100 feet of polling places without any complaint from the Secretary of State. (Mitofsky Aff. ¶ 13). Plaintiffs do not challenge the constitutionality of the February Directive.

In May 2004, plaintiffs requested written confirmation from defendant of their right to conduct exit polls on election day. Defendant's office responded to plaintiffs on June 6, 2004, informing them that defendant would again distribute an advisory to the county election boards before the election. The February Advisory was attached to the response.

For the next several months, plaintiffs attempted to obtain the new advisory from defendant. Plaintiffs were unsuccessful. On October 20, 2004, defendant issued Directive No. 2004-40 concerning "Polling Place Access." It stated as follows:

The Ohio Revised Code 3501.30, 3501.35 and 3599.24 collectively prohibit *anyone*, on Election Day from:

- Engaging in election campaigning within 100 feet of the entrance to a polling place.

- Entering a polling place for any reason other than to vote, unless the person is an election official, a challenger or witness appointed pursuant to R.C. 3505.21, or a police officer.

- Loitering, congregating, hindering or delaying a person from reaching or leaving the polling place.

On Thursday, October 28, 2004, plaintiffs learned that defendant had held a telephone conference with county election officials during which defendant instructed

the officials to prohibit exit polls within 100 feet of polling places. Plaintiffs refer to this as the "Oral Directive." On October 29, 2004, defendant confirmed, through his counsel, Keith Scott, that plaintiffs would not be permitted to conduct exit polls within the100 foot zone on November 2, 2004.

Plaintiffs filed this case and their motion for a temporary restraining order ("TRO") on the morning of Monday, November 1, 2004. In his memorandum in opposition to plaintiffs' TRO motion the same day, defendant vigorously defended the prohibition on exit polls within the 100 foot zone. Defendant argued, "allowing exit pollsters to situate themselves closer than 100 feet of the doors would unnecessarily contribute to potential commotion and turmoil" at the 2004 presidential election. (Mem. in Op. (Doc. 6) at 2). "If pollsters in Ohio are allowed to stand within the 100-foot zone," defendant continued, "they will potentially cause problems with crowding near the doors, which will affect voters coming in and going out of the polls." (*Id.* at 6). Defendant's brief went on to state that the 2004 presidential election "is unlike any election this State has seen before, and with the expected high turnout issuing an injunction allowing exit polls to be conducted within the statutorily mandated buffer zone is against the public interest." (*Id.* at 10). Defendant's memorandum in opposition to plaintiffs' TRO motion would make no sense unless defendant had instructed Ohio election officials not to permit exit polls within 100 feet of polling places.

The Court conducted a hearing on the motion. During the hearing, defendant's Director of Legislative Affairs, Dana Walch testified. Walch averred, "the instruction at this point has been to keep everybody but voters [challengers, and law

enforcement] . . . outside the 100 foot threshold." (Hearing Tr. at 36). Walch also

testified that it was concern over crowding at the polls that "was the reason for us

advising the boards of elections not to allow the media, for example, inside the buffer

zone." (Id. at 49). When asked, "You are merely moving [exit polling] a hundred feet

away from the polling place, is that correct?", Walch responded, "That is correct." (Id. at

34). Walch's testimony confirms that defendant had instructed Ohio election officials

not to permit exit polls within the 100 foot zone.

> Also on November 1, 2004, defendant issued a press release in which he stated:

> The media are demanding they can enter polling place zones across Ohio
> to conduct exit interviews. The news media will of course still be allowed
> to do any exit polling they desire beyond the 100-foot protection zone. As
> Secretary of State, I've been elected to defend the only "poll" that matters,
> and that is the vote of the people, not exit polls. Included in that right to
> vote is a right to privacy and allowing anyone inside the mandated 100-
> foot protection zone aside from voters and election officials would violate
> Ohioans' right to vote in privacy -- and I will not allow it.
> * * *
> I have instructed the county Boards of Elections across Ohio to maintain
> the 100-foot protection zone around all polling stations, preventing
> lawyers, news media, Republican or Democratic officials and any others
> who are not official poll workers from violating voters' right to exercise their
> vote in privacy and without intimidation or harassment. The US. District
> Court has agreed with my approach on previous issues in the last few
> weeks and I fully expect it will do so again this time.

> In his memorandum in opposition to plaintiffs' renewed motion for summary

judgment, defendant asserts he never issued the Oral Directive. Mem. in Op. (Doc. 52)

at 18, 36. In support of this proposition, defendant offers Dana Walch's affidavit. In

essence, Walch alleges that he conducted two telephone conferences with election

officials: one on October 22, 2004 and another on October 28, 2004. Walch avers the

topic of exit polls was addressed during the October 22, 2004 conference, at which time

he directed the officials' attention to the directive issued on October 20, 2004. Walch
maintains the subject of exit polls did not come up during the October 28, 2004
conference. Nothing in Walch's affidavit, however, negates plaintiffs' core assertion
that in late October 2004 defendant instructed Ohio election officials not to permit exit
polls within 100 feet of polling places.

The Court finds the uncontroverted evidence shows defendant issued a directive
to Ohio election officials in late October 2004 directing them, *inter alia,* to prohibit exit
polls within 100 feet of polling places. There is no genuine issue of material fact as to
whether defendant issued the Oral Directive.

On the evening of Monday, November 1, 2004, the Court granted plaintiffs'
motion for a TRO. The next morning, on election day, defendant issued a directive (the
"November Directive") instructing county board of elections, "news media personnel . . .
[m]ay be within 100 feet of polling places to conduct exit polling." In most instances
reporters were allowed to conduct exit polls within twenty-five feet of polling places.
There were no reports that exit poll reporters interfered with the voting process or
hindered voters in any way.

On April 28, 2005, while plaintiffs' first summary judgment motion was pending,
defendant rescinded the November Directive and issued directive No. 2005-09 (the
"New Directive"). The New Directive provides in part:

> The [Loitering] Statutes do not necessarily prohibit a person from
> conducting "exit polls" within the designated area. However, if a person
> conducting "exit polls" is "loitering" or "congregating" within the designated
> area, or otherwise "hindering" or "delaying" an elector from leaving the
> polling place, that person could be in violation of one or more of the
> [Loitering] Statutes.

Of course, to the extent possible, the Statutes should be construed to protect both the fundamental right to vote and the freedom of speech, rights which are guaranteed by the Ohio constitution and the United States Constitution.

On election day, it is the responsibility of county election officials and, more specifically, precinct judges and clerks — working in cooperation with local police officers (see R.C. 3599.31) — to enforce the Statutes at each polling place. Any person charged with a violation of one or more of the Statutes may be subject to prosecution by the county prosecutor or local municipal authorities, as applicable.

Plaintiffs assert the New Directive is unconstitutionally vague.

## D. Plaintiffs' Claims

Plaintiffs filed their second amended complaint for declaratory and injunctive

relief (Doc. 44) on October 18, 2005, asserting the following claims:

1.   The Oral Directive impermissibly restricts plaintiffs' speech and ability to

gather information in violation of the First Amendment;

2.   The New Directive is unconstitutionally vague in violation of the First and

Fourteenth Amendments; and

3.   To the extent they are interpreted to prohibit exit polls within 100 feet of

polling places, Ohio's election law loitering statutes impermissibly restrict

plaintiffs' speech and ability to gather information.

## II. Summary Judgment

The standard governing summary judgment is set forth in Fed. R. Civ. P. 56(c),

which provides:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together

> with the affidavits, if any, show that there is no genuine issue as to any
> material fact and that the moving party is entitled to judgment as a matter
> of law.

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if

the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment

is appropriate, however, if the opposing party fails to make a showing sufficient to

establish the existence of an element essential to that party's case and on which that

party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

(1986); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S.

574, 588 (1986).

When reviewing a summary judgment motion, the Court must draw all

reasonable inferences in favor of the nonmoving party, and must refrain from making

credibility determinations or weighing the evidence. *Reeves v. Sanderson Plumbing

Prods., Inc.*, 530 U.S. 133, 150-51 (2000). The Court disregards all evidence favorable

to the moving party that the jury would not be not required to believe. *Id.* Stated

otherwise, the Court must credit evidence favoring the nonmoving party as well as

evidence favorable to the moving party that is uncontroverted or unimpeached, if it

comes from disinterested witnesses. *Id.*

The Sixth Circuit Court of Appeals has recognized that *Liberty Lobby, Celotex,*

and *Matsushita* have effected "a decided change in summary judgment practice,"

ushering in a "new era" in summary judgments. *Street v. J.C. Bradford &* Co., 886 F.2d

1472, 1476 (6th Cir. 1989). The court in *Street* identified a number of important

principles applicable in new era summary judgment practice. For example, complex cases and cases involving state of mind issues are not necessarily inappropriate for summary judgment. *Id.* at 1479.

Additionally, in responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Id.* (quoting *Liberty Lobby*, 477 U.S. at 257). The nonmoving party must adduce more than a scintilla of evidence to overcome the summary judgment motion. *Id.* It is not sufficient for the nonmoving party to merely "'show that there is some metaphysical doubt as to the material facts.'" *Id.* (*quoting Matsushita*, 475 U.S. at 586).

Moreover, "[t]he trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Id.* at 1479-80. That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001).

### III. Discussion

The Court will first address defendant's jurisdictional defenses and then proceed to examine the merits of plaintiffs' First Amendment claims.

## A. Jurisdictional Defenses

### 1. Standing

Defendant argues the Court does not have subject matter jurisdiction in this case

because plaintiffs lack standing.

Article II of the U.S. Constitution limits federal judicial power to "Cases" and

Controversies." U.S. Const. Art. III, § 2; *see Nat'l Rifle Ass'n of America v. Magaw,* 132

F.3d 272, 279 (6th Cir. 1997). The case and controversy requirement applies to all

federal cases, including declaratory judgment actions. *See Calderon v. Ashmus,* 523

U.S. 740, 745-46 (1998). Courts enforce the case and controversy requirement through

the doctrines of standing, ripeness and mootness. *See Ohio ex rel. Celebrezze v.*

*United States Dept. of Transp.,* 766 F.2d 228, 232 (6th Cir. 1985).

> Over the years, our cases have established that the irreducible
> constitutional minimum of standing contains three elements. First, the
> plaintiff must have suffered an injury in fact-an invasion of a legally
> protected interest which is (a) concrete and particularized, see *id.,* at 756,
> 104 S.Ct., at 3327; *Warth v. Seldin,* 422 U.S. 490, 508, 95 S.Ct. 2197,
> 2210, 45 L.Ed.2d 343 (1975); *Sierra Club v. Morton,* 405 U.S. 727, 740-
> 741, n. 16, 92 S.Ct. 1361, 1368-1369, n. 16, 31 L.Ed.2d 636 (1972); and
> (b) actual or imminent, not conjectural or hypothetical, " *Whitmore, supra,*
> 495 U.S., at 155, 110 S.Ct., at 1723 (quoting *Los Angeles v. Lyons,* 461
> U.S. 95, 102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983)). Second,
> there must be a causal connection between the injury and the conduct
> complained of-the injury has to be fairly trace[able] to the challenged
> action of the defendant, and not th[e] result [of] the independent action of
> some third party not before the court. *Simon v. Eastern Ky. Welfare Rights*
> *Organization,* 426 U.S. 26, 41-42, 96 S.Ct. 1917, 1926, 48 L.Ed.2d 450
> (1976). Third, it must be likely, as opposed to merely speculative, that the
> injury will be redressed by a favorable decision. *Id.,* at 38, 43, 96 S.Ct., at
> 1924, 1926.

*Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992). The standing requirement

is relaxed in First Amendment cases. *See Nat'l Rifle Ass'n,* 132 F.3d at 290; *Amelkin v.*

*McClure,* No. 94-6161, 1996 WL 8112. at \* 4 (6th Cir. Jan. 9, 1996). Nonetheless, a plaintiff asserting a First Amendment claim must still allege a real and imminent injury which is not conjectural or hypothetical. *Amelkin,* at \* 4 (citing *Greater Cincinnati Coalition for the Homeless v. City of Cincinnati,* 56 F.3d 710, 715 (6th Cir. 1995)).

### a. Injury-in-fact

To demonstrate injury-in-fact, a plaintiff must show an invasion of a legally protected interest which is concrete and particularized, and actual or imminent, not conjectural or hypothetical. *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.,* 528 U.S. 167, 180 (2000). "A mere threat to First Amendment interests is a legally cognizable injury." *Deja Vu of Nashville, Inc. v. Metropolitan Gov't of Nashville,* 274 F.3d 377, 399 (6th Cir. 2001), *cert. denied,* 535 U.S. 1073 (2002).

Defendant argues plaintiffs have failed to present any evidence of a real and present threat of prosecution under the Loitering Statutes. Defendant also avers he has no present intention of enforcing the Loitering Statutes to prohibit exit polling.

Defendant maintains this case is analogous to *Adult Video Ass'n v. United States Dept. Of Justice,* 71 F.3d 563 (6th Cir. 1995). In *Adult Video,* the plaintiffs sought a judgment declaring that distribution of a pornographic video would not violate a federal obscenity statute. The plaintiffs in *Adult Video* did not challenge the constitutionality of the statute. The district court dismissed the case. The Sixth Circuit Court of Appeals affirmed the judgment of the district court, holding that the plaintiffs lacked standing because the plaintiffs could not point to any statement or action by a government official indicating the government intended to prosecute the plaintiffs. *Adult Video,* 71 F.3d at

567. The appellate court characterized the plaintiffs' claim as "in essence a *pre-application, as applied* challenge to federal law." *Id.* (emphasis in original).

Plaintiffs maintain *Adult Video* is distinguishable because in the case at bar, unlike *Adult Video,* there is ample evidence of defendant's intent to enforce the loitering statute in a manner violative of plaintiffs' First Amendment rights.  The Court agrees.  In the TRO proceedings and his press release, defendant openly declared his intention to exclude exit polling within 100 feet of polling places.  But for the TRO the Court issued on November 1, 2004, plaintiffs would have been excluded from conducting exit polls within 100 feet of the polling places.  Defendant does not unequivocally represent that he will not again seek to ban exit polls within the 100 foot zone at some point in the future.  Indeed, in the memoranda presently before the Court, defendant continues to advance the position that he may lawfully ban not only exit polls, but all First Amendment activity, within 100 feet of polling places.  Defendant has also demonstrated his proclivity to issue eleventh-hour directives affecting plaintiffs' First Amendment rights.  Absent an injunction, defendant would be free to reissue the Oral Directive on the eve of an election.  Moreover, during the pendency of this lawsuit, rather than adhere to previous, unchallenged directives, defendant issued the New Directive which plaintiffs argue is unconstitutionally vague.

In view of these circumstances, the Court finds that plaintiffs' injury is neither conjectural nor hypothetical.  Rather, plaintiffs have demonstrated an actual, concrete threat to their First Amendment interests.  For these reasons, the Court concludes that

plaintiffs have established injury-in-fact for purposes of asserting their First and

Fourteenth Amendment claims.

### b. Traceable to defendant's action

Defendant next argues plaintiffs are unable to establish their injury is traceable to

defendant. In essence, defendant contends he has no enforcement powers relative to

the Ohio election law Loitering Statutes. He maintains enforcement power is vested

solely in the local election judges and local police. Plaintiffs assert defendant's

representations in this lawsuit, and the relevant provisions of the Ohio Revised Code

demonstrate a causal connection between their injury and defendant's actions.

In his memorandum in opposition to plaintiffs' motion for a TRO, defendant

represented as follows:

> The Secretary of State is authorised by law to issue instructions by
> directives as to the proper methods of conducting elections. It is the
> Secretary's ultimate responsibility to ensure that a fair and organized
> election is held. *The County Boards of Elections are required to follow
> those directives issued by the Secretary of State.* In his pronouncement
> the Secretary of State was well within his statutory authority to take those
> necessary steps to ensure the integrity of the election process.

(Mem. in Op. (Doc. 6) at 8-9)(emphasis added). Ohio's election laws echo defendant's

representation. As Secretary of State, defendant is the chief election officer of the

State of Ohio. Ohio Rev. Code § 3501.04. Ohio law requires him to: (1) appoint the

members of the boards of elections; (2) issue instructions by directives and advisories

to board members concerning the proper methods of conducting elections; (3) prepare

rules and instructions for the conduct of elections; (4) compel election officers to

observe the requirements of election laws; and (5) investigate the administration of

election laws and report violations to the attorney general or the prosecuting attorney. Ohio Rev. Code § 3501.05(A), (B), (C), (M), and (N)(1). Ohio law requires the boards which defendant appoints to: (1) appoint and remove directors, deputy directors, registrars, judges and other officers; (2) make and issue rules and instructions not inconsistent with Ohio law or the rules, directives or advisories issued by the Secretary of State; and (3) to investigate violations of election laws and report any violations to the prosecutor. Ohio Rev. Code § 3501.11(D), (E) and (J). Ohio election laws also require police officers to obey election officers with respect to violations of the Loitering Statutes. Ohio Rev. Code § 3599.31.

Defendant controls the election process via the boards of election through the issuance of rules, directives and advisories, as well as his authority to appoint the board members. In turn, the board members appoint and exercise control over local election officials. Board members are also empowered to investigate violations of election laws and to refer them to the local prosecuting attorney. Local election officials have authority to direct local police in matters pertaining to violations of the Loitering Statutes.

Defendant has already demonstrated his ability to harm plaintiffs' First Amendment interests. But for the TRO issued by this Court on November 1, 2004, plaintiffs would have suffered irreparable injury as a direct result of defendant's instruction to election officials to prohibit exit polls within 100 feet of polling places.

In view of the clear chain of authority, as well as defendant's actions giving rise to this lawsuit, the Court must reject defendant's argument that plaintiffs' injury cannot

be traced to him because only local election officials and local police have enforcement power. The Court finds that plaintiffs have established their injury is traceable to defendant for purposes of standing.

### c. Capable of redress

Defendant asserts plaintiffs' alleged injury would not be redressed by a favorable ruling by this Court. Defendant's argument is once again based upon the premise that only local officials have authority to enforce the Loitering Statutes. The Court has already rejected that argument. Furthermore, the TRO the Court issued on November 1, 2004 was effective. The Court sees no reason why a permanent injunction would not afford plaintiffs the relief they seek.

For these reasons, the Court finds that plaintiffs' alleged injury is capable of being redressed by a favorable ruling from this Court. Based on the above, the Court concludes that plaintiffs have demonstrated Article III standing as a matter of law.

### 2. Ripeness

Defendant also contends this matter is not ripe for adjudication. Defendant argues that plaintiffs' claims are not concrete, and that plaintiffs seek an advisory opinion for an abstract and theoretical scenario. Defendant also maintains plaintiffs have failed to establish "a viable chilling of their First Amendment Rights." In addition, defendant suggests plaintiffs' exit polling does not appear to constitute loitering, congregating, hindering or delaying for purposes of the Loitering Statutes.

Plaintiffs assert they have demonstrated threatened harm. Plaintiffs maintain the

Oral Directive presented a threat of harm, and the New Directive currently presents a

threat of harm.

The Sixth Circuit Court of Appeals recently distilled the ripeness doctrine as

follows:

> Ripeness is a justiciability doctrine designed "to prevent the courts,
> through premature adjudication, from entangling themselves in abstract
> disagreements." *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S.
> 568, 580, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985) (internal quotation
> omitted). "Ripeness becomes an issue when a case is anchored in future
> events that may not occur as anticipated, or at all." *Nat'l Rifle Ass'n of Am.
> v. Magaw*, 132 F.3d 272, 294 (1997). . . . "In performing the ripeness
> inquiry, we must weigh three factors when deciding whether to address
> the issues presented for review: 1) "the likelihood that the harm alleged by
> the plaintiffs will ever come to pass"; 2) "whether the factual record is
> sufficiently developed to produce a fair adjudication of the merits of the
> parties' respective claims"; and 3) "the hardship to the parties if judicial
> relief is denied at this stage in the proceedings." *Adult Video Ass'n v.
> United States Dep't of Justice*, 71 F.3d 563, 568 (6th Cir.1995) (internal
> quotation and brackets omitted).

*Kentucky Press Ass'n, Inc. v. Commonwealth of Kentucky, 454* F.3d 505,    , 2006 WL

1867118, at * 2 (6th Cir. July 7, 2006). The ripeness requirement is somewhat relaxed

in First Amendment cases. *Norton v. Ashcroft,* 298 F.3d 547, 554 (6th Cir. 2002).

Nonetheless, a plaintiff asserting a First Amendment claim must still demonstrate a

credible fear of enforcement to establish ripeness. *Id.*

### a. Likelihood of harm

As the Court found when it issued the TRO, the Oral Directive, if not enjoined,

would have resulted in irreparable harm to plaintiffs. That threat still exists to the extent

defendant may again issue a directive prohibiting exit polls within 100 feet of polling

places. Defendant currently argues it would be constitutionally permissible to prohibit all First Amendment activity within 100 foot zone. Despite defendant's suggestion that plaintiffs' exit polling does not appear to violate the Loitering Statutes, defendant carefully avoids stating that he will not again seek to ban plaintiffs from conducting exit polls within 100 feet of polling places. In light of these facts, plaintiffs' fear of enforcement of such a measure is credible.

In addition, plaintiffs assert the New Directive is unconstitutionally vague because it gives local election officials unbridled discretion to enforce the Loitering Statutes. The likelihood that a local election official might impermissibly prohibit protected First Amendment activity within the 100 foot zone based upon the New Directive is not remote or abstract. For these reasons, the Court concludes plaintiffs have demonstrated a likelihood of harm for purposes of establishing ripeness.

### b. Sufficiently developed record

The record in this case consists of the facts and circumstances surrounding defendant's issuance of Oral Directive and the New Directive, as well as the text of the New Directive. The Court finds the record is sufficiently developed to allow the Court to rule on plaintiffs' First Amendment claims.

### c. Hardship

If judicial relief is denied, there is a real, concrete risk that exit polls may be excluded from the 100 foot zone. This would prevent plaintiffs from compiling otherwise irretrievable data, and result in irreparable hardship to plaintiffs.

Having examined the three relevant factors, and mindful that the ripeness

standard is somewhat relaxed in First Amendment cases, the Court concludes that

plaintiffs have established ripeness as a matter of law.

### 3. *Pullman* abstention

Defendant next argues the Court should abstain from determining plaintiffs'

constitutional claims under the *Pullman* abstention doctrine. Defendant maintains this

Court should certify the following question to the Supreme Court of Ohio: whether exit

polling as described in the affidavits submitted by plaintiffs constitutes a violation of the

Loitering Statutes. Plaintiffs contend that certification to the Ohio Supreme Court could

not avoid the constitutional issues raised in this case. Plaintiffs also assert the Court

should not abstain because doing so could delay a final decision until after the

upcoming election.

*Pullman* abstention is derived from *Railroad Comm'n of Texas v. Pullman Co.,*

312 U.S. 496 (1941). In *Pullman,* the Court held an Equal Protection Clause challenge

to a Texas railroad personnel regulation was prematurely adjudicated in federal court

because a state court's consideration might have rendered the regulation invalid on

state law grounds, thereby mooting the federal constitutional question. 312 U.S. at 501.

The Court has further explained the *Pullman* doctrine:

> Where there is an action pending in state court that will likely resolve the
> state-law questions underlying the federal claim, we have regularly
> ordered abstention. Similarly, when the state-law questions have
> concerned matters peculiarly within the province of the local courts, we
> have inclined toward abstention. On the other hand, where the litigation
> has already been long delayed, or where it has seemed unlikely that
> resolution of the state-law question would significantly affect the federal
> claim, the Court has held that abstention should not be required.

*Harris v. County Comm'rs Court v, Moore,* 420 U.S. 77, 83-84 (1974). The Sixth Circuit
Court of Appeals has established two requirements for *Pullman* abstention: 1) an
unclear state law and 2) the likelihood that a clarification of the state law issue would
obviate the necessity of deciding the federal claim question. *Tyler v. Collins,* 709 F.2d
1106, 1108 (6th Cir. 1983). Abstention, in general, should be applied only in
exceptional circumstances. *Quackenbush v. Allstate Ins. Co.,* 517 U.S. 706, 716
(1996); *Anderson v. Charter Township of Ypsilanti,* 266 F.3d 487, 492 (6th Cir. 2001).

Here, plaintiffs do not assert a facial vagueness challenge to the Loitering
Statutes. Furthermore, defendant concedes "the Loitering Statutes clearly do not
prohibit exit polling, . . ." (Mem. in Op. (Doc. 52) at 37 n.1). As a result, there is no
unclear state law for the Ohio Supreme Court to interpret. Moreover, this matter has
been pending since November 1, 2004, and significant mid-term elections will take
place in November. The Court finds that plaintiffs are entitled to a final decision before
the mid-term elections. Certification of a question to the Ohio Supreme would
undoubtedly delay a final decision until after the November mid-term elections. For
these reasons, the Court declines to abstain from exercising jurisdiction over this
matter.

## 4. Eleventh Amendment immunity

Defendant next argues that plaintiffs' claims are barred under the doctrine of
Eleventh Amendment immunity. Defendant contends the *Ex parte Young* exception to
Eleventh Amendment immunity does not apply in this case because he has no authority
to enforce the Loitering Statutes.

The Eleventh Amendment to the U.S. Constitution states:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. Generally, the Eleventh Amendment is an explicit limitation to the subject matter jurisdiction of the federal courts. *See Ford Motor Co. v. Dept. of Treasury,* 323 U.S. 459, 467 (1945). The U.S. Supreme Court has extended the Eleventh Amendment's meaning to preclude suits in federal court against a state by its own citizens. *See Hans v. Louisiana,* 134 U.S. 1 (1890). The Eleventh Amendment not only protects states from suit but may also shield state officials with immunity. *Lee v. W. Reserve Psychiatric Habilitation Ctr.,* 747 F.2d 1062, 1065 (6th Cir. 1984).

The U.S. Supreme Court has carved out an exception to Eleventh Amendment immunity for awards of prospective injunctive relief. Federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights. *Ex parte Young,* 209 U.S. 123, 160-62 (1908). The rule is limited to actions where the relief sought is equitable in nature and prospective in operation. *Edelman v. Jordan,* 415 U.S. 651, 664-68 (1974). Moreover, the *Ex parte Young* fiction does not apply unless the officer sued has "some connection with the enforcement of the act." *Ex parte Young,* 209 U.S. at 157.

In the instant case, plaintiffs seek only declaratory and prospective injunctive relief. Plaintiffs have not sued defendant asserting the Loitering Statutes are facially unconstitutional. Rather, plaintiffs sue defendant asserting that defendant's own conduct, *i.e.,* his issuance of the Oral Directive and the New Directive, violates the First

and Fourteenth Amendments. Thus, the inquiry is not whether defendant has threatened to enforce a particular act which is itself unconstitutional, but whether his own conduct violated federal law. "[S]tate officers who are violating a federal law may *always* be sued for purely injunctive relief-capacity and party in interest are irrelevant." *Nelson v. Miller,* 170 F.3d 641, 646 n.5 (6th Cir.1999) (emphasis in original). The Court therefore rejects defendant's argument that *Ex parte Young* does not apply because defendant allegedly has no authority to enforce the Loitering Statutes. The Court finds that the *Ex parte Young* exception applies to this case as a matter of law. For this reason, the Court holds that defendant is not entitled to immunity under the Eleventh Amendment.

## B. Plaintiffs' First Amendment Claims

### 1. Failure to state a claim

Defendant contends Count I of plaintiffs' second amended complaint fails to state a claim for relief under 42 U.S.C. § 1983. Defendant advances three arguments under this rubric: (1) plaintiffs have abandoned Count I of their second amended complaint; (2) the Oral Directive was never issued; and (3) the Oral Directive does not constitute an "official policy" or "custom" for purposes of § 1983 liability.

### a. Abandonment

Defendant first argues that plaintiffs have abandoned Count I because they failed to include argument about Count I in their renewed motion for summary judgment. The Court disagrees. The arguments plaintiff presents in connection with

Count III are fully relevant to Count I.[1] (*See* Mem. in Support of Renewed Mot. (Doc.
46-2) at 16-24). Moreover, at the conclusion of their memorandum, plaintiffs expressly
seek relief with respect to the Oral Directive. (*Id.* at 20). The Court therefore rejects
defendant's abandonment argument.

### b. Issuance of Oral Directive

Defendant maintains the Oral Directive was never issued. Defendant's assertion
does not merit further discussion. For the reasons set forth in Section I. C. above, the
Court finds as a matter of law that in late October 2004, defendant instructed Ohio
election officials to prohibit exit polls within the 100 foot zone.

### c. Official policy or custom

Defendant next argues Count I fails to state a claim because plaintiffs cannot
establish the Oral Directive was an official policy or custom for purposes of liability
under § 1983. Plaintiffs contend defendant has conceded he was acting in his official
capacity when he issued the Oral Directive.

Section 1983 provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State or Territory or the District of Columbia,
> subjects, or causes to be subjected, any citizen of the United States or
> other person within the jurisdiction thereof to the deprivation of any rights,
> privileges, or immunities secured by the Constitution and laws, shall be
> liable to the party injured in an action at law, suit in equity, or other proper
> proceeding for redress, . . .

---

[1] Counts I and III are two sides of the same coin. Count I challenges the Oral Directive. Count III
asserts the Loitering Statutes cannot be interpreted to effect an outright ban on exit polling within the 100
foot zone without violating the First Amendment. The Oral Directive is the embodiment of the Loitering
Statutes being interpreted to prohibit exit polls within 100 feet of polling places. In this sense, through
Counts I & III, plaintiffs attempt to avoid coming back to this Court at some point in the future to fight the
same battle they fought and won on November 1, 2004.

42 U.S.C. § 1983. To prevail in a § 1983 action, the plaintiff must demonstrate the following two elements: (1) the deprivation of a right secured by the Constitution or laws of the United States, and (2) the deprivation was caused by a person acting under color of state law. *Miller v. Calhoun County,* 408 F.3d 803, 812 (6th Cir.2005).

Defendant's argument that the Oral Directive was not an official policy or custom is devoid of merit. The Ohio Revised Code expressly grants defendant the authority to issue directives binding upon the boards of election. Ohio Rev. Code. § 3501.05(B). In issuing the Oral Directive, defendant was acting "under color of any statute, ordinance, regulation, custom, or usage." 42 U.S.C. § 1983.

In addition, as plaintiffs point out, defendant has acknowledged the issuance of the Oral Directive was an official act under color of state law, and that the Oral Directive has the force of state law:

> The Secretary of State is authorized by law to issue instructions by directives as to the proper methods of conducting elections. It is the Secretary's ultimate responsibility to ensure that a fair and organized election is held. The county Board of Elections are required by law to follow those directives issued by the Secretary of State. In his pronouncement the Secretary of State was well within his statutory authority to take those necessary steps to ensure the integrity of the election process. Denying him the right to do so will cause the Secretary of State to suffer substantial harm.

(Mem. in Op. (Doc. 6) at 8-9)(emphasis added). The Ohio Revised Code expressly authorized defendant to issue the Oral Directive. Defendant has conceded that he issued the Oral Directive pursuant to Ohio law and that the Oral Directive has the force of state law. The Court therefore finds that defendant was acting under color of state law for purposes of § 1983 when he issued the Oral Directive.

For the above reasons, the Court holds that Count I of plaintiffs' second amended complaint states a claim cognizable under 42 U.S.C. § 1983.

## C. Merits

### 1. Counts I and III

In Counts I and III, plaintiffs assert that defendant cannot lawfully prohibit exit polls within 100 feet of polling places on the basis of the Loitering Statutes.[2] Defendant argues he may ban all speech within the 100 foot zone.

The First Amendment provides, "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. The First Amendment applies to the States through the Fourteenth Amendment. *Thornhill v. Alabama*, 310 U.S. 88, 95 (1940). Defendant acknowledges exit polling is important speech protected by the First Amendment. (Mem. In Op. (Doc. 52) at 14); *Daily Harold Co. v Munro*, 758 F.2d 350, 358-59 (9th Cir. 1985).

Three binding decisions have scrutinized restrictions on the exercise of First Amendment rights at polling places: *Burson v. Freeman*, 504 U.S. 191, 210-11 (1992)(upholding ban on campaigning within 100 feet of polling places)[3]; *United Food & Commercial Workers Local 1099 v. City of Sidney*, 364 F.3d 738, 747-48 (6th Cir.

---

[2]  As the Court noted earlier, the Oral Directive is the embodiment of defendant's interpretation of the Loitering Statutes to bar exit polls in the designated area. The Court applies the same analyses and reaches the same conclusions with respect to Counts I and III. Both counts raise the same issue: whether defendant can lawfully bar exit polls within 100 feet of polling places.

[3]  In *Burson,* Justice Blackmun wrote the plurality opinion, in which Chief Justice Rehnquist and Justices White and Kennedy joined. Justice Scalia wrote a separate opinion concurring in judgment only. Justice Stevens wrote a dissenting opinion in which Justices O'Connor and Souter joined. Justice Thomas took no part in the decision.

2004)(upholding prohibition on soliciting signatures for petition within 100 feet of polling places); and *Anderson v. Spear*, 356 F.3d 651, 663 (6th Cir. 2004)(striking down as overbroad a 500 foot zone in which campaigning was prohibited). Defendant relies primarily upon *Burson* and *United Food*. Plaintiffs attempt to distinguish *Burson* and *United Food*, and rely on *Anderson*. The Court will examine each of these decisions in some detail.

In *Burson*, the plaintiff, Mary Rebecca Freeman, sought to enjoin the enforcement of a Tennessee statute creating a 100 foot "campaign-free zone" around polling places. After the chancery court denied her relief, the plaintiff appealed to the Supreme Court of Tennessee, which held the statute violated the First Amendment. The U.S. Supreme Court granted certiorari, and reversed the judgment of the Tennessee Supreme Court.

The plurality in *Burson* began its analysis by recognizing that the challenged statute regulated political speech. 504 U.S. at 196. The Court acknowledged that a major purpose of the First Amendment was to protect political speech. *Id.* "'For speech concerning public affairs is more than self-expression; it is the essence of self-government.'" Id. (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1964)). [T]he First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office." *Id.* (quotes omitted).

The Court noted the Tennessee statute barred speech in quintessential public forums, and the statute was not content neutral. *Id.* at 196-97. For these reasons, the Court concluded the statute was subject to strict scrutiny. *Id.* at 198. Tennessee

asserted the campaign-free zone served two state interests: (1) the right of citizens to vote freely for the candidates of their choice; and (2) the right to vote in an election conducted with integrity and clarity. The *Burson* Court found these interests to be compelling. *Id.* at 199.

The Court then turned its attention to whether Tennessee had demonstrated the statute was necessary to serve the interests asserted. It proceeded to outline the history of election reform in the United States and abroad. In short, until reforms in the late Nineteenth Century, voting in the United States was plagued by widespread bribery and intimidation. Ultimately, all fifty states adopted laws limiting access to areas around polling places. In view of this history, the Court found that some restricted zone around polling places "is necessary in order to serve the States' compelling interests in preventing voter intimidation and election fraud." *Id.* at 206.

The Court also addressed an underinclusiveness argument raised by Freeman and the dissent as follows:

> [R]espondent and the dissent argue that Tennessee's statute is underinclusive because it does not restrict other types of speech, such as charitable and commercial solicitation or exit polling, within the 100-foot zone. We agree that distinguishing among types of speech requires that the statute be subjected to strict scrutiny. We do not, however, agree that the failure to regulate all speech renders the statute fatally underinclusive. In fact, as one early commentator pointed out, allowing members of the general public access to the polling place makes it more difficult for political machines to buy off all the monitors. See Wigmore 52. But regardless of the need for such additional monitoring, there is, as summarized above, ample evidence that political candidates have used campaign workers to commit voter intimidation or electoral fraud. In contrast, there is simply no evidence that political candidates have used other forms of solicitation or exit polling to commit such electoral abuses. States adopt laws to address the problems that confront them. The First

Amendment does not require States to regulate for problems that do
not exist.

*Id.* at 207.

The Court proceeded to examine the 100 foot zone at issue.  In doing so, it
modified the strict scrutiny test.  The Court reasoned that it would be imprudent to
require the States to demonstrate the specific effects of a regulation because doing so
would necessitate that the State's political system undergo damage before the State
could take corrective action.  *Burson,* 504 U.S. at 209.  A regulation serving the State's
interest in preventing voter intimidation election fraud will therefore be upheld if the
regulation is reasonable and does not significantly impinge on constitutionally protected
rights.  *Id.*  Applying this test, the Court stated, "[t]he State of Tennessee has decided
that the last 15 seconds before its citizens enter the polling place should be their own,
as free from interference as possible.  We do not find that this is an unconstitutional
choice."  *Id.* at 210.  The Court concluded:

> [W]e reaffirm that it is the rare case in which we have held that a law
> survives strict scrutiny. This, however, is such a rare case. Here, the
> State, as recognized administrator of elections, has asserted that the
> exercise of free speech rights conflicts with another fundamental right, the
> right to cast a ballot in an election free from the taint of intimidation and
> fraud. A long history, a substantial consensus, and simple common sense
> show that some restricted zone around polling places is necessary to
> protect that fundamental right. Given the conflict between these two rights,
> we hold that requiring solicitors to stand 100 feet from the entrances to
> polling places does not constitute an unconstitutional compromise.

*Id.* at 211.

The Court will next examine the decision of the Sixth Circuit Court of Appeals in
*United Food.*  The plaintiffs in *United Food* attempted to solicit signatures for a

referendum petition near six polling places on election day.  The polling places were located at four public schools, a local Y.M.C.A. and a church.  At all locations plaintiffs were asked to leave the premises and in many cases were threatened with arrest.  The plaintiffs brought an action in federal district court under 42 U.S.C. § 1983, asserting the defendants had violated their First Amendment rights.  The district court granted the defendants' motions to dismiss and for judgment on the pleadings.  The Sixth Circuit Court of Appeals affirmed in part, reversed in part, and remanded the case to the district court.  *United Food,* 364 F.3d at 742, 753.

The court in *United Food* applied different levels of scrutiny depending on the nature of the forum at issue.  The court first addressed the bar on soliciting on a public sidewalk within the 100 foot zone.  The court indicated the content-based restriction at issue was subject to strict scrutiny because the speech took place in a traditional public forum.  *United Food,* 364 F.3d at 747.  The court then noted the Supreme Court upheld a similar "campaign free" zone in *Burson.*  "[T]he Court held that Tennessee could decide that the 'last 15 seconds before its citizens enter the polling place should be on their own, as free from interference as possible."  *United Food,* 364 F.3d at 747.  Applying *Burson,* the court in *United Food* concluded "a state may require persons soliciting signatures to stand 100 feet from the entrances to polling places without running afoul of the Constitution."  364 F.3d at 748.

The court next considered whether it was lawful to bar the plaintiffs from soliciting signatures on private property outside the 100 foot zone.  The court in *United Food* concluded that the parking lots and walkways leading to the polling places were

nonpublic forums. 364 F.3d at 750. The court upheld the restriction as a reasonable, viewpoint neutral measure. *Id.* at 751. Lastly, the court in *United Food* remanded the case to the district court to determine whether prohibiting the plaintiffs' speech in traditional public forums outside the 100 foot zone was a content-neutral time, place and manner restriction, or a content-based restriction subject to strict scrutiny. *Id.* at 752.

The Court will next examine the Sixth Circuit's decision in *Anderson.* The plaintiff in *Anderson* ran as a write-in candidate in Kentucky's 1999 gubernatorial election. He brought an action in district court under 42 U.S.C. § 1983 challenging, *inter alia,* a statute that prohibited him from distributing literature explaining how to cast a write-in ballot within 500 feet of polling places. The plaintiff argued the subject Kentucky statute was overbroad in violation of the First Amendment, and that its definition of electioneering was overbroad because it included speech that did not expressly advocate the election or defeat of any candidate. The district court granted summary judgment in favor of the defendants. The Sixth Circuit affirmed in part and reversed in part.

The court in *Anderson* began its analysis by examining *Burson.* It noted that *Burson* applied a modified strict scrutiny test, under which a state was required only to demonstrate that its response was reasonable and did not significantly impinge on constitutionally protected rights. *Anderson,* 356 F.3d at 656. The court also recognized that *Burson* identified only two compelling state interests: preventing voter intimidation and preventing election fraud. *Id.* at 657, 661.

After examining the proffered reasons for such a large restricted area, the court in *Anderson* held that the 500-foot zone was unconstitutionally overbroad because it significantly impinged on protected speech, and thereby failed the *Burson* test. The court also concluded that the expansive definition of "electioneering" was overbroad because it restricted protected speech that did not implicate the State's interests in preventing voter intimidation and election fraud. *Anderson,* 356 F.3d at 665-66. With these principles in mind, this Court will proceed to address the merits of Counts I and III.

The Court will first compare and contrast the nature of the speech in this case with the speech at issue in the aforementioned decisions. As noted above, exit polling is a form of speech protected under the First Amendment. *Daily Harold*, 758 F.2d at 358-59. It concerns elections, and is a form of political speech. Unlike the speech in *Burson* and *United Food,* however, exit polling cannot reasonably be construed as a form of electioneering under any definition of that term.[4] In contrast to the electioneering speech in *Burson* and *United Food*, there is no established history of exit polls corrupting or interfering with the voting process. Exit polling, as described by plaintiffs, simply does not implicate the State's interests in preventing voter intimidation and fraud. Indeed, as the Court in *Burson* suggested in its response to the dissent, general public access to polling places discourages intimidation and fraud. The

---

[4] Despite defendant's argument to the contrary, the court in *United Food* viewed the solicitation of signatures for a referendum petition to be a form of electioneering. *See* 364 F.3d at 751 ("There is no contention, for example, that others were permitted to solicit signatures for referendum petitions on other topics, or that anyone was allowed to engage in *other types of electioneering activities* within these areas. (emphasis added)).

presence of the press at polling places would likely serve as a deterrent to fraud and intimidation. Furthermore, both *Burson* and *United Food* refer to the sanctity of the "last 15 seconds" before the voter enters the polling place. *Burson,* 504 U.S. at 210; *United Food,* 364 F.3d at 747. By definition, exit polling affects only those who have already voted.

The Court will proceed to determine the level of scrutiny applicable to the Oral Directive or any measure barring exit polls within the 100 foot zone. There is, of course, no "text" of the Oral Directive. Plaintiffs learned on October 28 and 29, 2004 that defendant had issued an instruction to election officials to prohibit exit polls within 100 feet of polling places. Thus, there is some evidence indicating the Oral Directive was directed specifically against exit polls. To the extent the Oral Directive sought specifically to restrict plaintiffs' political speech in a traditional public forum, it is subject to strict scrutiny. *Burson,* 504 U.S. at 198. To pass strict scrutiny, a content-based restriction on speech must be narrowly tailored to serve a compelling state interest. *Id.* It is rare for a law to survive strict scrutiny. *Id.* at 211.

*Burson* however, also set forth a modified strict scrutiny applicable in some cases. Under the modified standard, a State must show that the interest at stake is compelling, its response is reasonable, and the restriction does not significantly impinge on constitutionally protected rights. *Id.* at 209; *Anderson,* 356 F.3d at 656. The Court in *Burson* instructed that the modified standard does not apply in all cases involving the election process:

> This modified burden of proof does not apply to all cases in which there is a conflict between First Amendment rights and a State's election process-

instead, it applies only when the First Amendment right threatens to
interfere with the act of voting itself, *i.e.,* cases involving voter confusion
from overcrowded ballots, like *Munro,* or cases such as this one, in which
the challenged activity physically interferes with electors attempting to cast
their ballots. Thus, for example, States must come forward with more
specific findings to support regulations directed at intangible influence,
such as the ban on election-day editorials struck down in *Mills v. Alabama,*
384 U.S. 214, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966).

504 U.S. at 209 n. 11. Here, the challenged activity, exit polling, does not interfere with

electors attempting to cast their ballots. Plaintiffs' evidence describing exit polling,

which defendant does not dispute, shows that exit polls do not hinder the act of voting

itself. Therefore, the *Burson* modified strict scrutiny does not apply. The Court

concludes that the Oral Directive, or any measure barring exit polls within 100 feet of

polling places, must survive traditional strict scrutiny to be upheld.

The information plaintiffs received on October 28 and 29, 2004, however, may

not have been the "full text" of the Oral Directive. As described in the testimony of

defendant's agent at the TRO hearing, as well as defendant's court papers and press

release, the Oral Directive purported to exclude *everyone* but voters, election officials,

challengers, and police officers from the 100 foot zone. Plaintiffs do not dispute these

representations, and in fact rely on them to prove the Oral Directive was issued.

Hence, some of the evidence in the record reflects that the Oral Directive was not

directed against exit polling in particular, or to any specific form or content of speech.

Insofar as it excluded anyone not expressly allowed in the designated area, the Oral

Directive was a content-neutral restriction.

To the extent it was a content-neutral measure, the Oral Directive is subject to intermediate scrutiny.[5] As the Court in *Burson* stated, a government may regulate the time, place and manner of speech, provided the restriction is content-neutral, narrowly tailored to serve a significant government interest, and leaves open ample alternatives for expression. 504 U.S. at 197; *Ward v. Rock Against Racism,* 491 U.S. 781, 791 (1989); *United States v. Grace,* 461 U.S. 171, 177 (1983). The record is unclear as to whether the Oral Directive barred only exit polls, or was directed more generally to prohibit all but a few categories of people within the 100 foot zone. The Court will therefore address the challenged restriction under both the strict and intermediate scrutiny standards.

Defendant argues that under *United Food,* and Justice Scalia's dissent in *Burson,* the Court must take into account the nature of the various forums surrounding polling places in determining the applicable level of scrutiny. *See United Food,* 364 F.3d at 750; *Burson,* 504 U.S. at 213-16 (concurring opinion by Scalia, J.)(opining that Tennessee statute was constitutional because it was a reasonable, viewpoint-neutral regulation of nonpublic forum). In *United Food*, the polling places at issue were set up at local public schools, a church, and a Y.M.C.A. The decisions to eject the plaintiffs from the property were made by local individuals who had direct authority over the property in question. Here, defendant does not purport to have direct authority over the

---

[5] In his response to plaintiffs' TRO motion, defendant argued for the application of intermediate scrutiny. At no point has defendant asserted that the Oral Directive only incidently affects free speech, requiring application of the four-part test set forth in *United States v. O'Brien,* 391 U.S. 367, 377 (1968). In any event, the challenged measure would not pass the fourth prong of the *O'Brian* test because the burden the challenged restriction places on speech is greater than necessary to accomplish its goal.

property surrounding polling places aside from the 100 foot zone itself. The Court therefore rejects defendant's forum argument.

Turning to the strict scrutiny analysis, the term "compelling interest" is not readily defined. *See Republican Party of Minn. v. White,* 416 F.3d 738, 749 (8th Cir. 2005). It has been described as an "interest of the highest order," "overriding state interest," and "unusually important state interest." *Id.*

Defendant issued the Oral Directive to address the State of Ohio's interest in preventing potential overcrowding and disruption at the polls in light of the high voter turnout expected for the November 2004 election. In *Burson* and *United Food,* the measures at issue addressed the well-documented history of voter intimidation and fraud in the United States. Although the *Burson* plurality opined that general public access to polling places helped to prevent voter intimidation and fraud, at some point overcrowding and disruption at polling places could make it easier for voter intimidation and fraud to occur. Indeed, an overcrowded and disruptive atmosphere at polling places might dissuade potential voters from going to the polls in the first place.[6] The Court therefore finds that the avoidance of overcrowding and disruption at polling places is a compelling interest.

Although the State of Ohio's interest in preventing overcrowding and disruption at polling places is compelling, to survive either strict or intermediate scrutiny,

---

[6] In this context, the Court interprets "overcrowding and disruption" to mean something more than mere high voter turnout and long lines at the polls.

defendant must also demonstrate that the challenged restriction is narrowly tailored to serve the state interest.

> In determining whether regulation of expressive activity is narrowly tailored, we look to determine whether the substantial government interest would be achieved less effectively without the [regulation]. Particular types of individual activity that might cause damage, endanger public safety, or interfere with other speakers, can be governed just as effectively, if not more so, by regulations prohibiting or limiting such actions directly . . . .

*Parks* v. *Finan*, 385 F.3d 694, 703 (6th Cir. 2004) (internal citation omitted). As this Court observed in its order granting plaintiffs' motion for a TRO, "there are statutory mechanisms already in place . . . which can be employed if a pollster's activities impede a voter's ability to exercise the right to vote."  Order (Doc. 9) at 8; *see* Ohio Rev. Code §§ 3501.30, 3501.35 and 3599.24.  The existing Loitering Statutes, which directly limit conduct within the 100 foot zone, effectively address the State of Ohio's interest in preventing overcrowding and disruption without resorting to barring exit polls, or, for that matter, all protected speech within the designated area.  For these reasons, the Court finds that the challenged measure is not narrowly tailored to serve a compelling or significant state interest.

Moreover, as a result of this Court's temporary restraining order, exit polls were conducted in Ohio during the November 2004 election within 100 feet of the polling places.  Despite high voter turnout, there is no evidence that plaintiffs' exit polls caused disruption, overcrowding or interfered with the voting process in any way.  The impact of exit polls on the voter egress appears to be negligible.  A measure banning exit polls in the 100 foot zone is therefore not necessary to achieve the State's interests regardless of whether those interests are characterized as compelling or significant.  In this sense,

the burden the challenged restriction places on speech is greater than necessary to accomplish its goal. *See United States v. O'Brien,* 391 U.S. 367, 377 (1968).

Plaintiffs also present evidence showing that exit polls conducted 100 feet away from polling places produce less reliable results. More accurate results can be achieved only if exit polls are conducted closer to the polling place. Defendant does not dispute plaintiffs' evidence on this point. Allowing plaintiffs to conduct exit polls outside the 100 foot zone only does not effectively leave open ample alternatives for expression as required by intermediate scrutiny. Likewise, if the modified strict scrutiny test set forth in *Burson,* were to be applied, the Court would be compelled to find that the challenged restriction significantly impinges plaintiffs' constitutionally protected right to free speech.

In sum, the Court concludes that to the extent it singles out and prohibits exit polls, the challenged restriction does not survive strict scrutiny because it is neither necessary nor narrowly tailored to serve the State of Ohio's interest in preventing overcrowding and disruption. For the same reasons, to the extent the challenged restriction effectively bars all speech within the 100 foot zone, it does not pass intermediate scrutiny. The Oral Directive therefore represents an unconstitutional restriction of plaintiffs' protected free speech. Any similar attempt to interpret Ohio's election Loitering Statutes to prohibit exit polls would likewise fail to pass constitutional muster. For these reasons, plaintiffs are entitled to summary judgment in their favor on Counts I and III of their second amended complaint. As a corollary, defendant's motion for summary judgment as to Counts I and III is denied.

## 2. Count II

In Count II of their second amended complaint, plaintiffs challenge the

constitutionality of the currently effective New Directive.  Plaintiffs argue the New

Directive is unconstitutionally vague.  Defendant does not directly address plaintiffs'

vagueness claim; rather, defendant maintains the Loitering Statutes are not themselves

facially unconstitutional.  The issue of the facial validity of the Loitering Statutes is not,

however, before the Court.

> It is a basic principle of due process that an enactment is void for
> vagueness if its prohibitions are not clearly defined. Vague laws offend
> several important values. First, because we assume that man is free to
> steer between lawful and unlawful conduct, we insist that laws give the
> person of ordinary intelligence a reasonable opportunity to know what is
> prohibited, so that he may act accordingly. Vague laws may trap the
> innocent by not providing fair warning. Second, if arbitrary and
> discriminatory enforcement is to be prevented, laws must provide explicit
> standards for those who apply them. A vague law impermissibly delegates
> basic policy matters to policemen, judges, and juries for resolution on an
> ad hoc and subjective basis, with the attendant dangers of arbitrary and
> discriminatory application. Third, but related, where a vague statute
> abut(s) upon sensitive areas of basic First Amendment freedoms, it
> operates to inhibit the exercise of (those) freedoms. Uncertain meanings
> inevitably lead citizens to steer far wider of the unlawful zone' . . . than if
> the boundaries of the forbidden areas were clearly marked.'

*Grayned v. City of Rockford,* 408 U.S. 104, 108-09 (1972).  Regulations affecting First

Amendment freedoms are subject to a more stringent vagueness test.  *Boddie v.*

*American Broadcasting Companies,* 881 F.2d 267, 270 (6th Cir. 1989).  "Because First

Amendment freedoms need breathing space to survive, government may regulate in

the area only with narrow specificity."  *NAACP v. Button,* 371 U.S. 415, 433 (1963).

Plaintiffs advance two vagueness arguments.  First, plaintiffs contend the New

Directive fails to provide the kind of notice that would enable an ordinary person to

understand what conduct it prohibits.  Second, plaintiffs maintain the New Directive

gives local election officials unbridled discretion to determine whether exit polling will be

permitted within the 100 foot zone.

The New Directive states in relevant part:

The [Loitering] Statutes do not necessarily prohibit a person from
conducting "exit polls" within the designated area. However, if a person
conducting "exit polls" is "loitering" or "congregating" within the designated
area, or otherwise "hindering" or "delaying" an elector from leaving the
polling place, that person could be in violation of one or more of the
[Loitering] Statutes.

Of course, to the extent possible, the Statutes should be construed to
protect both the fundamental right to vote and the freedom of speech,
rights which are guaranteed by the Ohio constitution and the United
States Constitution.

On election day, it is the responsibility of county election officials and,
more specifically, precinct judges and clerks — working in cooperation
with local police officers (see R.C. 3599.31) — to enforce the Statutes at
each polling place. Any person charged with a violation of one or more of
the Statutes may be subject to prosecution by the county prosecutor or
local municipal authorities, as applicable.

Plaintiffs contend the New Directive fails to give adequate notice because it

instructs local election officials, without further explanation, that an exit pollster "could

be" in violation of one or more of the Loitering Statutes if that person is "loitering,"

"congregating," or otherwise "hindering" or "delaying" a voter from leaving the polling

place.  In support of this proposition, plaintiffs rely primarily upon *Coates v. City of*

*Cincinnati,* 402 U.S. 611 (1971).

In *Coates,* the plaintiffs were a student involved in a demonstration and labor

dispute picketers.  They had all been convicted for violating a Cincinnati ordinance that

made it a criminal offense for "three or more persons to assemble . . . on any of the

sidewalks . . . and there conduct themselves in a manner annoying to persons passing

by . . . . The Supreme Court of Ohio affirmed the convictions, finding that the ordinance

was "precise and narrowly drawn." *City of Cincinnati v. Coates,* 21 Ohio St. 2d 66, 69

(1970).

The U.S. Supreme Court reversed, holding the ordinance was unconstitutionally

vague because it subjected the right of assembly to an unascertainable standard.

*Coates,* 402 U.S. at 614. The Court explained:

> Conduct that annoys some people does not annoy others. Thus, the
> ordinance is vague, not in the sense that it requires a person to conform
> his conduct to an imprecise but comprehensible normative standard, but
> rather in the sense that no standard of conduct is specified at all. As a
> result, men of common intelligence must necessarily guess at its
> meaning. *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46
> S.Ct. 126, 127, 70 L.Ed. 322.

*Coates,* 402 U.S. at 614.

As noted above, plaintiffs do not purport to assert a facial vagueness challenge

to the Loitering Statutes themselves. The Court therefore declines to interpret plaintiffs'

argument to be an assertion that the terms "loitering," "congregating," "hindering" and

"delaying" are unconstitutionally vague in the context of the statutes. Instead, the Court

understands plaintiffs as arguing that these terms are rendered vague in the context of

the New Directive only. In this sense, the instant case differs sharply from *Coates.* In

*Coates,* the undefined term "annoying" was unconstitutionally vague. Here, in contrast,

plaintiffs maintain that defendant's attempt to explain the applicability of the Loitering

Statutes is void for vagueness.

The New Directive instructs that the Loitering Statutes do not "necessarily" preclude a person from conducting exit polls within the 100 foot zone, followed by a reference to the specific terms used in the Loitering Statutes to describe the prohibited conduct. Plaintiffs do not attempt to explain how this aspect of the New Directive is vague, other than to discuss *Coates*. In this sense, plaintiffs' vagueness argument is itself vague.

The Court finds that the New Directive, in conjunction with the Loitering Statutes, provide sufficient information such that a person of common intelligence would understand what conduct is prohibited. In essence, the New Directive gives notice that an exit pollster could be found to violate the Loitering Statutes. This is legally correct and not difficult to understand. Although exit polling as described by plaintiffs would not violate the Loitering Statutes, the possibility remains that a renegade pollster could depart from the norm and engage in prohibited conduct. The First Amendment would not protect an exit pollster who blocks the exit of a polling place, for example. The Court has ruled that the Loitering Statutes cannot be construed to bar exit polls without offending the First Amendment. The ruling, however, does not go so far as to hold that an individual pollster could never lawfully be charged under the statutes.

Plaintiffs also contend the New Directive is void for vagueness because it gives local officials unbridled discretion to determine violations of the Loitering Statutes. It is unclear, however, how the discretion of local officials under the New Directive differs from the discretion the officials would have in the absence of any directive. Again, plaintiffs do not purport to assert a facial vagueness challenge against the Loitering

Statutes, and have not argued that defendant is constitutionally compelled to issue directives to explain them. Unbridled discretion, if it exists, must in this case be the result of the language of the New Directive itself.

In this regard, plaintiffs assert the New Directive's reference to the fundamental rights at stake invites local officials to engage in their own *ad hoc* constitutional analysis without the benefit of any guidance. The Court disagrees. The admonition concerning the right to vote and the right to free speech does no more than remind local officials of the gravity of their decisions. It does not give rise to unconstitutional vagueness.

For the above reasons, the Court holds that the New Directive is not unconstitutionally vague. Defendant is therefore entitled to summary judgment in his favor on Count II of plaintiffs' second amended complaint. For the same reasons, plaintiffs' motion for summary judgment is denied with respect to Count II.

## V. Disposition

Based on the above, the Court **GRANTS** plaintiffs' summary judgment motion (Doc. 46) as to Counts I and III of the second amended complaint, and **DENIES** it with respect to Count II . The Court **GRANTS** defendant's summary judgment motion (Doc. 51) as to Count II of the second amended complaint, and **DENIES** it with respect to Counts I and III .

For the above reasons, the Court **ORDERS, ADJUDGES AND DECREES** as follows:

1.    The Oral Directive violates the First Amendment of the U.S. Constitution and is therefore void.

2. Ohio's Loitering Statutes, Ohio Rev. Code §§ 3501.30, 3501.35 and 3599.24, cannot be interpreted to prohibit exits polls within the 100 foot designated area around polling places without violating the First Amendment to the U.S. Constitution.

3. The Court permanently enjoins defendant and all those acting in concert with him from enforcing the Oral Directive.

4. The Court permanently enjoins defendant and all those acting in concert with him from enforcing or issuing any rule, directive, advisory, policy or communication that would prohibit exit polls within the 100 foot designated area around polling places.

5. The Court orders defendant to issue a written directive by **October 15, 2006** to Ohio election officials which shall prominently include the following language: "It would be unlawful, and a violation of the First Amendment to the U.S. Constitution, to interpret, apply, or enforce Ohio's election Loitering Statutes, Ohio Rev. Code §§ 3501.30, 3501.35 and 3599.24, to prohibit exit polls within 100 feet of polling places."

The Clerk shall remove this case from the Court's pending cases and motions lists.

The Clerk shall remove Doc. 46 and Doc. 51 from the Court's pending motions list.

**IT IS SO ORDERED.**

**MICHAEL H. WATSON, JUDGE**
**UNITED STATES DISTRICT COURT**